# No. 25-50976

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**United States of America**,
Plaintiff-Appellant,

v.

**James Wesley Burger**,
Defendant-Appellee.

On Appeal from the United States District Court
for the Western District of Texas
Austin Division, No. 1:25-CR-332

**Emergency Motion to Stay Orders
Dismissing Indictment and Releasing Defendant**

The government respectfully moves this Court under Federal Rule of Appellate Procedure 8(a)(2) to stay the district court's orders of November 24 and 25, 2024, dismissing the superseding indictment against Defendant James Wesley Burger and releasing him without court supervision.

**Introduction and Nature of Emergency**

Burger was indicted on three counts of transmitting threats interstate in violation of 18 U.S.C. § 875(c) after he announced online that he would "attain martyrdom" at a "music festival [a]ttracting bounties of Christians" on a specific date and would "[d]etonate . . . munitions" and "use [his] firearms . . . [o]n the path of martyrdom" if approached by law enforcement. Citing these and other statements and his affinity for firearms, a magistrate judge detained

Burger pending trial. But the district judge orally dismissed the charges against Burger pretrial and issued a one-page order postponing any written explanation for its decision. At the same time, the district judge rebuffed the government's effort to stay the dismissal or otherwise moderate the danger posed by releasing Burger without any form of court supervision.

The district court's erroneous and largely unexplained dismissal of the indictment—and its resulting unsupervised release of Burger—justify this Court's emergency intervention. Burger's statements and comments detailed below establish the threat of irreparable harm necessary to justify prompt action. At a minimum, this Court should stay the district court's dismissal and release orders until the district court issues a written explanation for the dismissal so that the government has an adequate opportunity to further substantiate its strong likelihood of success on appeal. The government seeks a ruling by December 3, 2025.

## Background

This case arises from threats Burger, then a high school senior living in a suburb of Austin, Texas, issued in an online platform called Roblox. Roblox allows users to create online environments called "experiences"—often games, but sometimes more like chatrooms—that they and other users can populate through online avatars. Burger issued his threats using avatars "Ghurabahh" and "Crazz3pain" in a Roblox environment called "Church." Roblox users reported some of Burger's threats, which they saw as a series of transient messages that appeared above his avatars' heads for ten seconds. Law enforcement

captured Burger's other statements in Roblox through a keystroke logger his uncle installed on the computer Burger used after becoming concerned about Burger's behavior. The government obtained evidence that Burger intentionally used Roblox for his communications because he believed it was less likely to be monitored and because law enforcement would not take seriously any statements made on that platform.

On January 21, 2025, after saying he was going to donate funds to the Islamic State using Bitcoin, Burger—using the avatar Ghurabahh— stated:

> Yes I have guns
> Incase the authorities
> Want to arrest me

Att. Q (Gov't Trial Ex. 3) at 2-3.[1] When another avatar asked, "[W]hat are you gonna do if they try?" Burger responded:

> I am ready
> To sacrifice my life
> For my Rabb
> Detonate what I've prepared
> Of munitions
> And use my firearms
> To take many with me
> Yes wish me luck
> On the path of martyrdom
> In'shaa'allah

---

[1] Relevant parts of the record are attached to this motion as Attachments A through Q. *See* Fed. R. App. P. 8(a)(2)(B)(iii).

*Id.* at 6-10. An experienced Roblox user in Pennsylvania saw this statement, believed it to be a threat—as opposed to "trolling" (deliberate provocation) or role-playing, and reported it to the FBI.

On January 23 and 27, 2025, Burger made statements on Roblox indicating that he was planning to attack a Christian music concert or festival, kill or injure the Christians, and seek or achieve martyrdom. On January 23, when a Roblox user asked, "[H]ow many days until you do thay [sic]?" Burger—using the avatar Crazz3pain— responded:

> It will be months
> Shawwal
> April
> It will be a glorious wound
> Upon their capitol
> And deal a grievous wound upon the followers of the Cross

Att. D (Detention Hr'g Exs.) at 2-5. The other user responded, "Akhi, we will make dua for u once u martyr," "I[']ll keep you in my prayers," and "InshaAllah ill follow after you." *Id.* at 5-6. Burger then replied,

> I cannot confirm anything aloud at the moment
> But things are in motion

*Id.* at 6. When the other user turned to another avatar and said, "ALI MY BROTHER IS ABOUT TO DO HIS ATTACK," Crazz3pain responded, "Don't delay yourselves too long brothers, Jannah [heaven] awaits us." *Id.* at 7-8. An experienced Roblox user in Nevada saw this exchange and believed it to be a threat as opposed to trolling or role-playing. That witness also reported statements by Crazz3pain not captured in screenshots, including that

4

Crazz3pain would do something at a Christian music concert and become a martyr; that he would punish worshippers of the cross; and that another user could check Discord, an online-communication platform, to see photographs of the guns Crazz3pain planned to use in the attacks.

On January 27, a keystroke logger on the computer Burger was using indicates that he (as Crazz3pain), stated

> I've come to conclude it will befall the 12 of Shawwal aa
> And it will be a music festival
> Attracting bounties of Christians
> In'shaa'allah we will attain martyrdom
> And deal a grievous wound upon the followers of the Cross
> Pray for me and enjoin yourself to martyrdom

*Id.* at 11 (line breaks added for readability). As Burger's earlier statement clarifies, "the 12 of Shawwal" means April 12, and there was a prominent Christian concert scheduled for April 12, 2025, in Austin. The government anticipates presenting trial evidence, based on witness testimony and examination of Burger's electronics, that Burger visited the website for LiveNation, the concert promoter, before and after January 27. *Id.* at 14. Based on examination of Burger's phone, witnesses will testify Burger searched for "Festivals happening near me."

The government also uncovered other concerning messages from Burger before and after the charged threats. In an online post on 4-chan viewed by an FBI employee in March 2024, Burger said that his highest ambition was to be a successful serial killer. In July 2024, he typed—in a message captured by the keystroke logger—that he wanted to attack the Austin Police Department and

5

pledged allegiance to the head of the Islamic State. In February 2025, the keylogger captured Burger typing, "We're getting our knives sharpened for your throats." Around the same time, Burger stated that he wanted to perpetrate a stabbing attack like a "friend" in Europe and that he was willing to sacrifice himself "in a blaze of iron and metal…raining bullets upon disbelievers and their soldiers/police."

Burger was arrested on state charges on February 28, 2025. While in state custody after his arrest, he wrote down plans to make a bomb and a list of mass-casualty attacks. Att. D at 16-17, 26. On May 19, 2025, Burger was transferred into federal custody pursuant to a federal complaint. Att. A (Compl.). The government sought pretrial detention because of the risk he would flee and the danger he presented to the community. Att. B (Mot. to Detain). Burger had access to guns owned by his uncle and took and shared one or more pictures of himself with those guns, including sharing one with the person with whom he was discussing his planned attack on the Christian concert. Att. D at 12-13. After a contested hearing, a magistrate judge granted the government's motion to detain and found that no condition or combination of conditions of release would assure his appearance or assure the community's safety. Att. C (Detention Order).

A federal grand jury charged Burger with two counts of violating 18 U.S.C. § 875(c), which makes it a federal crime to "transmit[] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another." Count One covered Burger's statements on January 23,

2025, and Count Two covered Burger's statements on January 27, 2025. In a superseding indictment, another grand jury added Count Three, which covered Burger's statements on January 21, 2025. Att. E (Superseding Indictment). He pleaded not guilty.

Burger moved to dismiss the indictment pretrial under Federal Rule of Criminal Procedure 12(b)(1). Att. F (Def. Mot. to Dismiss). He argued that the indictment sought to punish him for protected First Amendment expression because his statements were not constitutionally unprotected true threats. *Id.* at 17. The statements could not be true threats, he argued, because they were insufficiently specific and because the context—an online environment populated by avatars—"drained" the statements of "gravity." *Id.* at 17-18. Invoking the Due Process Clause, he also argued that § 875(c) was unconstitutionally vague. *Id.* at 21-22. The government opposed the motion. Att. G (U.S. Resp. to Def. Mot. to Dismiss).

The district court held hearings on the motion to dismiss the indictment on November 18 and 24, 2025.[2] At the end of the second hearing, the district court, mentioning only Burger's First Amendment arguments, orally granted the motion to dismiss. About one hour after the hearing, the government moved to stay the dismissal order until after the issuance of a written order.

---

[2] The government has ordered expedited transcripts of these proceedings but has not received them.

Att. K (U.S. Mot. to Stay).[3] The defense opposed a stay, *see* Att. L, and the government provided a brief in support of its position the next day, *see* Att. M. On November 25, 2025, the court denied a stay. Att. N (Order). Without mentioning the factors cited by the magistrate judge in detaining Burger or the government's brief in support of a stay, the court stated that the government had failed to show that a stay was warranted or that Burger poses a danger to the community. *Id.* On November 26, 2025, the district court issued a written order dismissing the indictment. Att. O. The order offered no reasoning for the dismissal but said a memorandum would be "forthcoming." *Id.* The government immediately appealed. Att. P. Meanwhile, Burger was released unconditionally.

## Argument

Although "[a] stay is not a matter of right," a stay "may be called for" when the court is "faced with serious legal questions that merit careful scrutiny and judicious review." *Texas v. United States*, 126 F.4th 392, 421-22 (5th Cir. 2025) (cleaned up). The movant for a stay "need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay." *Id.* (cleaned up). Courts consider those equities by looking at four factors:

---

[3] The defense faulted the government for not orally requesting a stay at the conclusion of the hearing. Att. L (Def. Resp. to Mot. to Stay) at 1. While it is true that the government attorneys, responding to a question from the court, stated that the effect of the court's oral pronouncements would be Burger's release, the government did not waive or agree not to seek a stay of the court's order. Immediately after the hearing, the government requested a stay.

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009). Here, those equities weigh strongly in favor of a stay.

## I. The government is likely to succeed on the merits.

The district court dismissed the indictment pretrial under Federal Rule of Criminal Procedure 12 and cited in open court Burger's argument that the First Amendment protected the statements charged as violations of § 875(c) because they were not true threats. This Court will review that dismissal de novo, *United States v. Jubert*, 139 F.4th 484, 489 (5th Cir. 2025), and is likely to reverse.

The district court's apparent conclusion that Burger's statements were not true threats as a matter of law is insupportable. "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). The modifier "true" distinguishes them from "jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Id.* What the speaker conveys—not what he intends to convey—is what makes a statement a true threat. *See id.* If "an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm," then a

9

statement is a true threat. *Jubert*, 139 F.4th at 490. And at least when that statement is also the basis for a criminal prosecution, the government must also show that the speaker was aware of and recklessly disregarded its threatening nature. *See Counterman*, 600 U.S. at 79; *Jubert*, 139 F.4th at 491. When a statement meets both these requirements, it is outside the bounds of expression protected by the First Amendment and punishable as a crime. *Counterman*, 600 U.S. at 69; *Jubert*, 139 F.4th at 491.

Burger's statements meet these requirements. An objectively reasonable person would interpret each of his statements as an intent to cause a present or future harm. In his January 21 statement, he expressed his readiness to "detonate" "munitions" and "use [his] firearms" if law enforcement officers tried to arrest him. Att. Q at 6-9. Two days later, he said he would "deal a grievous wound upon the followers of the Cross" in "April" and that "things [we]re in motion." Att. D at 3-7. Four days after that, he "conclude[d]" that on "the 12 of Shawwal"—which he had previously clarified meant April—he would "deal a grievous wound upon the followers of the Cross" at a "music festival" "[a]ttracting bounties of Christians." Att. D at 3-7. The evidence also supports the inference that Burger was aware of the threatening nature of these statements: He used Roblox in part to avoid detection and refused to "confirm anything aloud" even as he signaled an intended attack. *See United States v. Elashi*, 554 F.3d 480, 499 (5th Cir. 2008) ("[G]uilty knowledge can be inferred from . . . attempted coverups."); Att. D at 7.

10

Despite Burger's arguments to the contrary, these statements were specific enough to be true threats. A true threat need not "name 'a particular individual or group of individuals'" because none of the factors that renders threats unworthy of First Amendment protection "turns on whether a speaker names individuals or merely places them where those individuals are likely to be." *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (quoting *Black*, 538 U.S. at 359). For example, in *Perez*, the defendant posted online, during the opening weeks of the COVID-19 pandemic, that an infected person had licked groceries in two stores. *Id.* at 440. This Court rejected the defendant's argument that his threat needed to be directed at a group more specific than all employees and potential shoppers at those stores. *Id.* at 443-44. Similarly, Burger's statements that he planned to "deal a grievous wound upon the followers of the Cross" at a concert attracting Christians on a particular date was sufficiently specific. *See also United States v. Miah*, 120 F.4th 99, 107-08 (3d Cir. 2024) (upholding conviction under § 875(c) for posting coordinates of FBI headquarters alongside comment "the zero hour is approaching"). So was Burger's statement that he planned to use munitions and firearms against any law enforcement officer who tried to arrest him. *See United States v. Elonis*, 841 F.3d 589 (3d Cir. 2016) (on remand from Supreme Court, upholding conviction under § 875(c) for statement that "if worse comes to worse/I've got enough explosives to take care of the state police and Sheriff's Department").

Nor did anything about the context of Burger's statements—that is, that they appeared in Roblox—remove them from the category of true threats as a

matter of law. This Court has declined to rule that statements were not true threats as a matter of law even when context could be read to undermine the seriousness of the threat. For example, in *Perez*, this Court upheld the jury's finding that a reasonable person could take the defendant's statements about COVID-19 exposure seriously even though they were delivered alongside cry-laughing and winking emojis. *See id.* Moreover, two witnesses familiar with Roblox generally and the "Church" environment in particular took Burger seriously. Although "[f]ear, standing alone, may not be dispositive," that fear can also be the "predictable result of deliberate conduct." *Jubert*, 139 F.4th at 491.

Compounding the district court's error was its decision to dismiss pretrial under Federal Rule of Criminal Procedure 12. Rule 12 allows a defendant to raise a purported "defect in the indictment or information" through a "pretrial motion" that "can be determined without a trial on the merits." A motion can be determined without trial on the merits "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense" raised by that motion. *United States v. Covington*, 395 U.S. 57, 60 (1969). So "the propriety of granting a motion to dismiss an indictment under [Rule] 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (cleaned up), *abrogated on other grounds*, *Abramski v. United States*, 573 U.S. 169, 191 (2014). "If contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12

doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1257 (10th Cir. 2010) (Gorsuch, J.).

The district court's apparent conclusion that it could decide itself whether Burger's statements were true threats without addressing a full trial record conflicts with this Court's precedent. This Court has committed to a jury the question whether a reasonable person would have interpreted a statement as a serious expression of intent to cause harm. *See Perez*, 43 F.4th at 443 (relying on a jury's finding that the defendant's posts might reasonably have been believed); *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001) (explaining that "a reasonable juror could find all the facts necessary to make [the defendant's] communication a 'true threat'"); *cf. Jubert*, 139 F.4th at 439 (upholding a district court's decision to defer until trial a determination of whether statements were true threats). Likewise, whether to infer knowledge from a defendant's conduct is a task for a jury. *See, e.g.*, *United States v. Lopez-Urbina*, 434 F.3d 750, 758 (5th Cir. 2005). The district court improperly bypassed the jury by ruling pretrial under Rule 12.

Finally, although the district court never mentioned in court Burger's vagueness argument under the Due Process Clause, the government would likely prevail on that argument even if the district court were to claim now that it had relied on it. The "touchstone" of any vagueness analysis is "'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *United States v. Coleman*, 609 F.3d 699, 706 (5th Cir. 2010) (quoting *United States v. Lanier*, 520

13

U.S. 259, 267 (1997)). Applying this standard, the Third Circuit has recently rejected a similar challenge. *Miah*, 120 F.4th at 108. The Third Circuit held that because conviction under § 875(c) requires proof of the defendant's subjective awareness that others would reasonably view a statement as a threat, there is no risk that "a defendant will be convicted for an action that he or she committed by mistake." *Id.*

## II. The government will be irreparably injured absent a stay.

The government's interests—which also implicate the public's interests embodied in the fourth factor, *see Nken*, 556 U.S. at 435—would be irreparably harmed absent a stay. Society has a strong interest in enforcing criminal law and prosecuting offenders. *United States* v. *Herman*, 576 F.2d 1139, 1146 (5th Cir. 1978). That interest increases with the severity of a particular offense, and "[w]hen the crime is serious, the public interest is high." *Id.* at 1147. Thus, a court must consider the danger to the community a defendant poses. *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). Burger demonstrated a desire to attack attendees at a Christian concert, *see supra* pp. 3-5, and the magistrate judge detained him based on that demonstrated desire as well as his "affinity for firearms and violence, his continued drug use, and the lack of any residence to which he could be released." Att. C at 1-2. The district court erred in flatly dismissing this danger—and releasing Burger without any form of court supervision—without addressing the magistrate judge's findings or the government's evidence supporting detention, *see* Att. N at 2.

### III. Any injury to Burger can be mitigated.

A stay need not substantially injure Burger. Should this Court stay the district court's dismissal order, the district court could consider whether detention would be necessary or whether to release Burger under supervision during this appeal. *See* 18 U.S.C. §§ 3142(c), (e), 3143(c). That supervision would better assure public safety while this Court considers this appeal. In failing to even consider that option, the district court erred.[4]

### Conclusion

This Court should stay the district court's dismissal and release orders pending resolution of this appeal so that Burger can promptly go before the district court for a detention hearing under 18 U.S.C. §§ 3142 and 3143. At a minimum, this Court should stay the district court's dismissal and release orders until the district court issues a written explanation for the dismissal so that the government has an adequate opportunity to further substantiate its strong likelihood of success on appeal.

---

[4] To minimize any delay, the government intends to move to expedite this appeal as soon as the district court issues the written explanation for its ruling. Without that written explanation, the government is not in a position to recommend briefing deadlines.

          Respectfully submitted,

          Justin R. Simmons
          United States Attorney

By: */s/ Zachary C. Richter*
     Zachary C. Richter
     Assistant United States Attorney
     903 San Jacinto, Suite 334
     Austin, Texas 78701
     (512) 916-5858
     Zachary.C.Richter@usdoj.gov

**Attachments**
A. ECF 1 Complaint
B. ECF 3 Government Motion for Detention
C. ECF 13 Detention Order
D. ECF 14 Government Exhibit List and Exhibits from Detention Hearing
E. ECF 40 Superseding Indictment
F. ECF 53 Defendant's Motion to Dismiss Indictment
G. ECF 59 Government's Response to Motion to Dismiss Indictment
H. ECF 63 Defendant's Reply to Government's Response Motion to Dismiss
I. ECF 68 Defendant's Post-Hearing Supplement to Motion to Dismiss
J. ECF 70 Government's Post-Hearing Supplement in Opposition to Motion to Dismiss
K. ECF 72 Government's Motion to Stay
L. ECF 74 Defendant's Response to Motion to Stay
M. ECF 75 Government's Brief in Support of Motion to Stay
N. ECF 76 Order Denying Motion to Stay
O. ECF 77 Order Granting Motion to Dismiss
P. ECF 78 Government's Notice of Appeal
Q. Government Trial Exhibit 3 (submitted to the district court November 24, 2025)

**Certificate of Conference & Compliance with Fifth Circuit Rule 27.3**

I certify that the facts supporting emergency consideration of this motion are true and complete, and that before filing the motion, the U.S. Attorney's Office called the Clerk of Court's office and attempted during business hours to contact opposing counsel Jose Gonzalez-Falla and Charly Herring by voicemail and email advising both that the United States intends to file this emergency motion and seeking their position on it. At the time of filing, opposing counsel has not responded.

/s/ *Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney

Dated: November 26, 2025

\* \* \*

**Certificate of Service**

I certify that on November 26, 2025, I filed this motion through this Court's electronic case-filing system, which will serve it on all registered counsel, and sent paper copies to registered counsel by overnight delivery.

/s/ *Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney

**Certificate of Compliance with Federal Rule of Appellate Procedure 27**

I certify that

(1) this document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,687 words; and

(2) this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in Calisto MT font, size 14.

*/s/ Zachary C. Richter*
Zachary C. Richter
Assistant United States Attorney

Dated: November 26, 2025