# No. 25-50976
### consolidated with
# No. 25-51021

# In the United States Court of Appeals for the Fifth Circuit

---

**United States of America,**

Plaintiff-Appellant,

v.

**James Wesley Burger,**

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Western District of Texas

---

## APPELLANT'S BRIEF FOR THE UNITED STATES

---

Justin R. Simmons
United States Attorney

Zachary C. Richter
Mark T. Roomberg
Assistant United States Attorneys
Western District of Texas
903 San Jacinto Blvd., Suite 334
Austin, Texas 78701
(512) 916-5858

**Recommendation on Oral Argument**

Oral argument is scheduled for January 20, 2026.

# Table of Contents

Recommendation on Oral Argument.................................................... i

Table of Contents.................................................................................. ii

Table of Authorities.............................................................................v

Introduction.........................................................................................1

Jurisdiction .........................................................................................1

Statement of the Issues ......................................................................2

Statement of the Case.........................................................................2

    I.    Burger threatened to attack a Christian music concert and law enforcement. ...................................................................2

    II.   The district court dismissed federal charges against Burger and ordered him released. ......................................................8

        A.    A magistrate judge ordered Burger detained because he presented a danger that conditions of release could not address............................................................8

        B.    A federal grand jury indicted Burger for issuing threats interstate, but the district court dismissed the indictment a week before trial and ordered Burger released..............................................................................9

        C.    After this Court stayed the order releasing Burger unconditionally, the district court again ordered Burger released unconditionally. ...................................11

        D.    Over two weeks after it dismissed the indictment, the district court offered its written justification for doing so. ...............................................................................13

        E.    After this Court stayed the district court's second order releasing Burger, the district court issued a third order releasing Burger. .........................................14

Summary of the Argument ................................................................16

Argument ........................................................................................17

    I.    The district court erred in dismissing the indictment because it misapplied Rule 12 and this Court's precedent on true threats ....................................................................17

        A.    Standard of review: This Court reviews indictment dismissals de novo. .....................................................19

        B.    The district court misapplied Rule 12 by improperly resolving disputed facts pretrial. ...................................19

        C.    The district court misapplied Rule 12 by improperly resolving disputed facts on an incomplete pretrial record. .......................................................................24

        D.    Burger's threats to attack Christians and law enforcement were unprotected true threats. ...................27

            1.    Counts One and Two allege unprotected true threats against a Christian music festival. ...............28

            2.    Count Three alleged a true threat against law enforcement. ........................................................31

            3.    That Burger's threats appeared in the online platform Roblox did not mean they were not true threats. ..........................................................32

    II.    The district court abused its discretion in releasing Burger unconditionally. ................................................34

        A.    Standard of review: This Court asks whether the evidence as a whole supports the release order. .............34

        B.    The evidence as a whole does not support the district court's order releasing Burger unconditionally. ..............34

C.   The district court erred procedurally in releasing
     Burger on personal recognizance. .................................37

     1.   The district court erred procedurally by failing
          to reopen the detention proceeding........................37

     2.   The district court erred procedurally by failing
          to follow the release provision it invoked. ..............39

D.   The district court lacked jurisdiction to enter its third
     release order, which remains a nullity...........................39

III.  This Court should reassign this case to a different district
      judge on remand. ................................................42

Conclusion..........................................................46

Certificate of Service ..............................................47

Certificate of Compliance ...........................................47

# Table of Authorities

## **Cases**

*Abramski v. United States*,
573 U.S. 169 (2014)...........................................................................19

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023)...........................................................................39

*Counterman v. Colorado*,
600 U.S. 66 (2023)....................................................... 10, 17, 18, 22

*Griggs v. Provident Consumer Disc. Co.*,
459 U.S. 56 (1982)...........................................................................40

*Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011)...........................................................34

*Miller v. Sam Houston State Univ.*,
986 F.3d 880 (5th Cir. 2021)..................................................... 43, 45

*United States v. Cabello*,
No. 25-40482, 2025 WL 2738463 (5th Cir. Sept. 23, 2025).....34, 38, 39

*United States v. Coalwell*,
No. 20-50869, 2021 WL 4768286 (5th Cir. Oct. 12, 2021) 18, 20, 21, 29

*United States v. Covington*,
395 U.S. 57 (1969)...........................................................................20

*United States v. Cox*,
957 F.2d 264 (6th Cir. 1992)...........................................................24

*United States v. Daughenbaugh*,
49 F.3d 171 (5th Cir. 1995) .....................................................passim

*United States v. Elonis*,
841 F.3d 589 (3d Cir. 2016)...........................................................22

*United States v. Flores*,
404 F.3d 320 (5th Cir. 2005)..................................................... 19, 26

*United States v. Jubert*,
139 F.4th 484 (5th Cir. 2025) ...................................................passim

*United States v. Khan*,
997 F.3d 242 (5th Cir. 2021)..................................................42, 43, 45

*United States v. Mann,*
  517 F.2d 259 (5th Cir. 1975)............................................................20

*United States v. Miah,*
  120 F.4th 99 (3d Cir. 2024) ...........................................................23

*United States v. Morales,*
  272 F.3d 284 (5th Cir. 2001).......................................... 18, 27, 30, 31

*United States v. Myers,*
  104 F.3d 76 (5th Cir. 1997) ....................................................... 31, 32

*United States v. O'Dwyer,*
  443 F. App'x 18 (5th Cir. 2011)................................................. 27, 32

*United States v. Perez,*
  43 F.4th 437 (5th Cir. 2022) ...................................................30, 32, 33

*United States v. Pope,*
  613 F.3d 1255 (10th Cir. 2010).............................................20, 25, 26

*United States v. Rafoi,*
  60 F.4th 982 (5th Cir. 2023) ...........................................................25

*United States v. Rodríguez-Rivera,*
  918 F.3d 32 (1st Cir. 2019)..............................................................25

*United States v. Rueben,*
  974 F.2d 580 (5th Cir. 1992)............................................................34

*United States v. Sholley-Gonzalez,*
  996 F.3d 887 (8th Cir. 2021)............................................................25

*United States v. Viefhaus,*
  168 F.3d 392 (10th Cir. 1999).........................................................23

*United States v. Wedd,*
  993 F.3d 104 (2d Cir. 2021)............................................................25

*United States v. Willis,*
  76 F.4th 467 (5th Cir. 2023) ...............................................40, 41, 42

*Virginia v. Black,*
  538 U.S. 343 (2003)...........................................................10, 17, 30

## Statutes

18 U.S.C. § 875 ............................................................................ 9, 10

18 U.S.C. § 922 ................................................................................26

18 U.S.C. § 3142 .......................................................................passim

18 U.S.C. § 3143 .......................................................................passim

18 U.S.C. § 3145 ......................................................................... 38, 41

18 U.S.C. § 3731 .......................................................................... 1, 37

## Rules

Fed. R. App. P. 10 ........................................................................... 3

Fed. R. App. P. 32 ...........................................................................47

Fed. R. Crim. P. 12 ...............................................................10, 13, 19

Fed. R. Crim. P. 29 ........................................................................27

## Other

Natalie Neysa Alund & Benjamin Johnson, *'Burn the infant': Woman convinced child to try to kill 2-month-old on Roblox, police say*, USA Today (Oct. 23, 2204), https://www.usatoday.com/story/news/nation/2024/10/23/tara-sykes-roblox-convinced-child-kill-baby-pensacola/75804569007/ ......33

Osmond Chia, *Texas sues Roblox for 'putting paedophiles and profits' over safety*, BBC (Nov. 6, 2025), https://www.bbc.com/news/articles/cy0kd4kk0kqo ........................33

Queenie Wong, *'Real-life nightmare for kids.' 'Roblox' faces multiple lawsuits over child safety*, L.A. Times (Aug. 15, 2025), https://www.latimes.com/business/story/2025-08-15/roblox-faces-lawsuits-over-child-safety................................................................33

## Introduction

Defendant-Appellant James Wesley Burger, posting across a variety of online platforms, pledged his allegiance to ISIS and announced his intent to engage in violent attacks, including an attack on a Christian music festival. A federal grand jury charged three of those announcements as violations of 18 U.S.C. § 875(c), which prohibits issuing threats interstate. But the district court, characterizing Burger's statements as "playing a game," dismissed the indictment pretrial and released him. That was error. This Court has repeatedly held that whether a statement is a true threat is a question for a jury. This case should be remanded for trial so that a jury can answer it.

## Jurisdiction

The government appeals from the district court's orders of November 24, November 26, and December 10, 2025, dismissing the indictment against Defendant-Appellant Burger, and the district court's orders of November 24 and December 4, 2025, releasing Burger from detention. ROA.495, 514-15, 523-30, 715. The district court had jurisdiction under 18 U.S.C. § 3231. The government filed timely notices of appeal on November 26, December 11, and December 31, 2025. ROA.496-97, 532-33; Notice of Appeal, *United States v. Burger*, No. 1:25cr332 (W.D. Tex. Dec. 31, 2025). This Court has jurisdiction under 18 U.S.C. § 3731. The Solicitor General has authorized these appeals.

1

## Statement of the Issues

Burger was indicted for issuing a threat interstate in violation of 18 U.S.C. § 875(c) after he stated online that he would attack a Christian music festival and law enforcement. The district court treated Burger's threats as speech protected by the First Amendment, dismissed the indictment before trial, and released Burger.

**1.** This Court has held that whether a statement is a true threat not protected by the First Amendment is a question for a jury. Did the district court err in dismissing the indictment on an incomplete and disputed pretrial record based on its own answer to that question?

**2.** After this Court stayed the district court's order releasing Burger unconditionally, did the district court abuse its discretion by again releasing Burger unconditionally?

**3.** On remand, should this case be reassigned to a different district judge?

## Statement of the Case

### I.    Burger threatened to attack a Christian music concert and law enforcement.

This case arises from threats Burger, then a high school senior living in a suburb of Austin, Texas, issued in an online platform called Roblox. ROA.11-21, 547. Roblox allows users to create online environments called "experiences"—often games, but sometimes chat rooms—that they and other users can populate with online avatars. ROA.548-50;

Mot. Hr'g Tr. 33, *United States v. Burger*, No. 1:25cr332 (W.D. Tex. Dec. 31, 2025) [hereinafter Dec. 29 Hr'g].[1] Burger issued his threats using avatars "Ghurabahh" and "Crazz3pain" in a Roblox chat room called "Church." *Id.* at 33; ROA.36-45, 391, 526, 551-55; Gov't Ex. List, Ex. 1, 3, *United States v. Burger*, No. 1:25cr332 (W.D. Tex. Dec. 29, 2025), ECF No. 107 [hereinafter Dec. 29 Exs.].[2] Roblox users reported some of Burger's threats, which they saw as a series of transient messages that appeared above his avatars' heads for ten seconds. ROA.36-45, 391, 526, 551, 553-54. Law enforcement captured Burger's other statements in Roblox through a keystroke logger installed by Burger's uncle, who had become concerned about Burger's behavior. ROA.557-58.

On January 21, 2025, Burger—using the avatar Ghurabahh—stated:

> Yes I have guns
> Incase the authorities
> Want to arrest me

ROA.359. When another avatar asked, "[W]hat are you gonna do if they try?" Burger responded:

> I am ready
> To sacrifice my life
> For my Rabb
> Detonate what I've prepared

---

[1] This transcript was completed on an expedited basis two days before the deadline for this expedited brief and has not been added to the electronic record on appeal or entered on the district court's docket.

[2] These exhibits, which were filed in the district court, are part of the record on appeal, *see* Fed. R. App. P. 10(a)(1), but have not yet been paginated in this Court's electronic record on appeal.

> Of munitions
> And use my firearms
> To take many with me
> Yes wish me luck
> On the path of martyrdom
> In'shaa'allah

ROA.360-63. An experienced Roblox user in Pennsylvania saw this state-
ment, believed it to be a threat—as opposed to "trolling" (deliberate
provocation) or role-playing, and reported it to the FBI. ROA.390-91,
526; Dec. 29 Ex. 3; Dec. 29 Hr'g 33-34.

On January 23 and 27, 2025, Burger made statements on Roblox in-
dicating that he was planning to attack a Christian music festival, kill or
injure the Christians, and seek martyrdom. On January 23, Burger—us-
ing the avatar Crazz3pain—appeared in "Church" alongside Roblox user
"xanderange," an ISIS supporter in Saudi Arabia, and "KardalAlli," a
Bosnian ISIS recruiter. Dec. 29 Hr'g 32; ROA.36-39, 551-52. When xan-
derange asked, "[H]ow many days until you do thay [sic]?" Burger re-
sponded:

> It will be months
> Shawwal
> April
> It will be a glorious wound
> Upon their capitol
> And deal a grievous wound upon the followers of the
> Cross

ROA.36-39, 551-52. Xanderange responded, "Akhi, we will make dua
for u once u martyr," "I[']ll keep you in my prayers," and "InshaAllah ill
follow after you." ROA.39-40, 552-53. Burger replied,

4

> I cannot confirm anything aloud at the moment
> But things are in motion

ROA.40, 554. Xanderange then turned to KardalAlli and said, "ALI MY

BROTHER IS ABOUT TO DO HIS ATTACK," and Burger responded,

"Don't delay yourselves too long brothers, Jannah [heaven] awaits us."

ROA.42-43, 553.

An experienced Roblox user in Nevada saw this exchange and be-

lieved it to be a threat as opposed to trolling or role-playing. ROA.390-

91, 526, 554-55. That witness also reported statements by Crazz3pain

not captured in screenshots, including that Crazz3pain would do some-

thing at a Christian music concert, punish worshippers of the Cross, and

become a martyr. ROA.554-55. As part of this exchange, Burger told an-

other user he could check Discord, an online-communication platform,

where he apparently posted photographs of guns before being warned to

delete those photographs lest his chat be "flagged as suspicious."

ROA.13-14.

On January 27, Burger (as Crazz3pain) appeared again in Roblox to

expand on this threat. ROA.12, 561. His statements were captured by a

keylogger Burger's uncle installed after becoming concerned about

Burger's behavior. Dec. 29 Tr. 34-35.[3] Burger announced:

> I've come to conclude it will befall the 12 of Shawwal aa
> And it will be a music festival
> Attracting bounties of Christians
> In'shaa'allah we will attain martyrdom

---

[3] Burger's aunt and uncle, who owned the computer with the keylogger on it, later consented to the FBI searching that computer. ROA.557-558, 573, 595-99.

> And deal a grievous wound upon the followers of the
> Cross
> Pray for me and enjoin yourself to martyrdom

ROA.12, 561 (line breaks added for readability). As Burger's earlier state-
ment clarified, "the 12 of Shawwal" meant April 12. ROA.37. There was
a prominent Christian concert scheduled for April 12, 2025, in Austin.
ROA.14, 561, 591-92, 690-91, 694; Dec. 29 Hr'g 22-23.

Burger declared his desire to engage in violent attacks before and af-
ter the charged threats, including in platforms other than Roblox. Early
on, a person in Houston reported that a user called "Africaner"—
Burger—was posting on Discord about a mass killing or a day of vio-
lence. Dec. 29 Hr'g 15. In an online post on the platform 4-chan that was
retrieved and viewed by an FBI employee in March 2024, Burger said
that his highest ambition was to be a successful serial killer and that he
planned to kill several groups of people. Dec. 29 Ex. 5.[4] In July 2024,
Burger typed—in messages captured by the keystroke logger—that he
wanted to attack the Austin Police Department and pledged allegiance to
the Islamic State and ISIS. Dec. 29 Exs. 10a, 18; Dec. 29 Hr'g 21-22.
Burger shared ISIS propaganda, including images of beheadings and at-
tacks on churches. Dec. 29 Ex. 19. In a December 2024 Discord chat, he
gave a user in Russia suggestions about how to make a bomb. ROA.653;
Dec. 29 Ex. 11. In a December 2024 Telegram chat and a January 2025

---

[4] A clerical error caused two government exhibits from the Dec. 29 hearing to be
labled "Exhibit 4." The second "Exhibit 4"—a 4-Chan post—should be Exhibit 5
and is found on page 28 of entry 107 on the district court's docket.

Discord chat, Burger glorified dying as a martyr. Dec. 29 Exs. 25, 26; Dec. 29 Hr'g 23. In February 2025, the keylogger captured Burger typing, "We're getting our knives sharpened for your throats." Dec. 29 Ex. 10b. Around the same time, Burger stated that he wanted to perpetrate a stabbing attack like a "friend" in Europe, Dec. 29 Ex. 14 at 3, that he would stab "[a]uthorities, Christians, any disbelievers," *id.*, and that he was willing to sacrifice himself "in a blaze of iron and metal…raining bullets upon disbelievers and their soldiers/police," Dec. 29 Ex. 13 at 9.

Burger's activities were not limited to statements online, but extended to real-world preparation. Burger visited the website for LiveNation, the company promoting the April 12 concert, before and after January 27. ROA.48, 566-67. He also searched for "Festivals happening near me." ROA.19, 561; Dec. 29 Ex. 9 at 5. He had access to guns owned by his uncle, ROA.562, 565-66; took and shared one or more pictures of himself with those guns. ROA.46; and wrote that he was "doing some good proper rifle training," Dec. 29 Ex. 22 at 3. Burger's uncle became so concerned about Burger's behavior that he removed firearms from the house. Dec. 29 Hr'g 34-35.

On February 28, 2025, the FBI executed a federal search warrant at the house where Burger lived with his aunt and uncle. ROA.557, 562. Burger's phone was seized under the search warrant. ROA.579. Agents

found Burger there and conducted a lengthy interview.[5] ROA.562, 583. After the interview, state authorities arrested Burger on state charges. ROA.598.

## II. The district court dismissed federal charges against Burger and ordered him released.

Burger's threats resulted in federal charges, but shortly before trial, the district court dismissed those charges and released Burger.

### A. A magistrate judge ordered Burger detained because he presented a danger that conditions of release could not address.

In May 2025, Burger was transferred into federal custody under a federal criminal complaint. ROA.11. During this transfer, authorities discovered that Burger had notes that included plans to make a bomb, a list of terrorist attacks, and a list of phone contacts that corresponded to contacts in his phone. ROA.567-69; Dec. 29 Ex. 15 at 1-2. An FBI expert confirmed that the bomb-making plans could result in an operational explosive device. ROA.418, 420-21. And the list of terrorist attacks ended with the notations "#JeSuisISIS"—"I am ISIS"—and "#JeSuisEtatIslamique." ROA.569-70; Dec. 29 Ex. 15 at 4; Dec. 29 Tr. 36.

---

[5] The interview lasted between 11 and 12 hours. ROA.107, 684. Burger moved to suppress statements he made during the interview, which he argued was custodial, because the agents did not give him *Miranda* warnings. ROA.107. The government elected not to offer Burger's statements during its case-in-chief but reserved the right to use the statements in cross-examination if Burger testified. ROA.405-06, 621-23. Burger agreed that the government's election resolved the issue his motion to suppress raised. ROA.621-23.

The government sought pretrial detention because of the risk Burger would flee and the danger he presented to the community. ROA.23-24. A magistrate judge held a contested detention hearing. ROA.542-612; *see* 18 U.S.C. § 3142(f). An FBI agent testified. ROA.546. The agent recounted Burger's threats, ROA.548-61; the discovery of Burger's internet searches for nearby festivals and photos of Burger posing with firearms, ROA.561-62, 565-66; the decision by Burger's uncle to remove firearms from his home because of Burger's behavior, ROA.562; and the discovery of Burger's bomb-making notes and list of terrorist attacks, ROA.562, 567-70. In argument after the testimony, Burger's counsel argued against detention but conceded that he "requires supervision" and "monitoring." ROA.605.

At the end of the hearing, the magistrate judge ordered Burger "detained until this case is concluded." ROA.609; *see* 18 U.S.C. § 3142 (e). The magistrate judge had "no doubt" that Burger was "prepared to execute" an attack. ROA.610. The magistrate judge also issued a written detention order laying out his findings. ROA.33-34; *see* 18 U.S.C. § 3142 (g), (i). Burger did not ask the district court to review this order.

**B.    A federal grand jury indicted Burger for issuing threats interstate, but the district court dismissed the indictment a week before trial and ordered Burger released.**

A federal grand jury charged Burger with two counts of violating 18 U.S.C. § 875(c), which makes it a federal crime to "transmit[] in interstate or foreign commerce any communication containing . . . any threat

to injure the person of another." Count One covered Burger's statements on January 23, 2025, and Count Two covered Burger's statements on January 27, 2025. In a superseding indictment, another grand jury added Count Three, which covered Burger's statements on January 21, 2025. ROA.96-98. He pleaded not guilty. ROA.617.

Burger moved to dismiss the indictment pretrial under Federal Rule of Criminal Procedure 12. ROA.351-74. Rule 12 authorizes a party to "raise by pretrial motion any defense . . . that the court can determine without a trial on the merits," including "a defect in the indictment" such as a "failure to state an offense." Fed. R. Crim. P. 12(b)(1), (3)(B). He argued that the indictment sought to punish him for speech protected by the First Amendment. The government responded that the First Amendment did not protect Burger's statements because they were true threats—that is, "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).[6] *See* ROA.394-99. The district court held a motion hearing. ROA.619-80. At the hearing, the court commented, "[I]f we go to trial, the jury would never know this, but if I were on the jury, I would acquit him,"

---

[6] Burger also argued that § 875(c) was unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. The district court never addressed this argument. ROA.525.

ROA.641, and accused the government of selective prosecution, ROA.643. But the court did not rule. ROA.676.

The next week—at a pretrial status conference a week before the beginning of trial—the district court heard more argument, orally granted the motion to dismiss, and directed that Burger be released. ROA.682-719. Although the government sought to stay the dismissal and release orders, the district court denied that motion. ROA.475-76, 483-91, 493-94. Two days after its oral order, the district court issued a written dismissal order that offered no reasoning but said a memorandum would be "forthcoming." ROA.495. The government immediately appealed. ROA.496. Meanwhile, Burger was released unconditionally.

### C. After this Court stayed the order releasing Burger unconditionally, the district court again ordered Burger released unconditionally.

The same day Burger was released on the district court's order, the government filed an emergency motion in this Court to stay the district court's dismissal and release orders. Emergency Mot. to Stay, ECF No. 12-1. The government noted that if this Court stayed the district court's orders, the district court could consider whether detention would be necessary or whether to release Burger under supervision pending appeal. *Id.* at 15 (citing 18 U.S.C. §§ 3142, 3143). This Court administratively stayed the dismissal and release orders for ten days

> to give the district court time to: (1) provide its reasons for dismissing the superseding indictment against James Wesley Burger and ordering him released from custody, Fed.

11

> R. Crim. P. 12(d); and (2) provide this court with a tran-
> script of Burger's detention hearing and the motions hear-
> ings in this case.

Unpub. Order, ECF No. 28-1. This Court provided that the stay did "not affect any relief that the district court may provide pursuant to 18 U.S.C. § 3143." *Id.*[7]

The government moved immediately for a hearing on whether to detain Burger or release him on conditions. ROA.498-500. Burger responded by moving for release on personal recognizance without a hearing. ROA.505-07. In that motion, defense counsel asserted that Burger "ha[d] no firearms, weapons, or munitions" and "d[id] not pose a danger." ROA.506. The government opposed his motion, reiterated the evidence presented at Burger's detention hearing, and explained that it would present additional evidence, including evidence that Burger had been preparing for an attack when he was arrested. ROA.510-12.

The district court granted Burger's motion and denied the government's. ROA.514-15. The court started by stating incorrectly that the government "made no objection" when the court "stated its intention to have Burger released following the dismissal of the indictment." ROA.514. *But see* ROA.717-18. Citing this Court's statement that its stay did "not affect any relief the district court may provide pursuant to 18 U.S.C. § 3143," the district court determined that the cross-reference in

---

[7] This Court later extended the stay to December 20, 2025. Unpub. Order, ECF No. 41-1.

§ 3143(c) to § 3142 meant it could release Burger on personal recognizance under § 3142(b). ROA.514-15. Without addressing the evidence presented to the magistrate judge, the magistrate judge's findings, or the additional evidence proffered in the government's opposition to release, the court stated that Burger "poses no flight or safety risk" and that the government "raise[d] no facts that suggest otherwise." ROA.515. The government filed a new notice of appeal from the second release order and immediately moved this Court to vacate that order. ROA.532; U.S. Emergency Mot. to Vacate, ECF No. 51-1.

### D. Over two weeks after it dismissed the indictment, the district court offered its written justification for doing so.

Meanwhile, on December 10, the district court issued an "order" it described as "stating [its] 'essential findings' pursuant to Fed. R. Crim. P. 12(d)." ROA.523-30. The court treated Rule 12 as requiring it to "perform[] a gatekeeping function" by "dismiss[ing] an indictment if no reasonable juror could find that the communication at issue was a 'true threat.'" ROA.525. The court then narrowed its view to the facts presented in four paragraphs of the government's opposition to the motion to dismiss and preemptively excluded evidence of Burger's preparations and expressions of readiness for an attack. ROA.526-27. Adopting Burger's position that he was just *playing a game* when he spoke in Roblox, the court concluded that Burger's statements were not true threats because of their "lack of specificity and the role-playing context

13

in which [they were] made." ROA.527-30 (emphasis in original). In an abundance of caution, the government appealed from this order as well. Notice of Appeal, *United States v. Burger*, No. 1:25cr332 (W.D. Tex. Dec. 31, 2025), ECF No. 109.

### E.    After this Court stayed the district court's second order releasing Burger, the district court issued a third order releasing Burger.

On December 22, a panel of this Court extended its stay of the district court's dismissal and first release order indefinitely and indefinitely stayed the district court's second release order. Unpub. Order 1-2, ECF No. 79-1. Addressing the second release order, this Court noted that "[s]ince there has been no involvement by Pretrial Services in this matter, the district court's reasoning reflects only the representations of defendant's counsel." *Id.* at 3. This Court also noted that even Burger's counsel had "indicated . . . that for this troubled individual, the court should consider 'strict' release conditions." *Id.* Based on the evidence offered by the government over multiple hearings, a stay was warranted. *Id.*

The parties agreed that this Court's stay meant that the magistrate judge's order requiring Burger's detention was back in effect. Burger Mot. to Revoke, Att. A at 1, *United States v. Burger*, No.1:25cr332 (W.D. Tex. Dec. 23, 2025), ECF No. 98-1. To secure Burger's detention, the government sought a warrant for Burger's arrest. U.S. Mot. for Arrest Warrant, *United States v. Burger*, No.1:25cr332 (W.D. Tex. Dec. 23, 2025), ECF No. 99. But Burger sought to have the detention order revoked.

14

Burger Mot. to Revoke, *United States v. Burger*, No.1:25cr332 (W.D. Tex. Dec. 23, 2025), ECF No. 98. On December 23, a different magistrate judge scheduled a hearing on those motions for December 29. Order, *United States v. Burger*, No.1:25cr332 (W.D. Tex. Dec. 23, 2025), ECF No. 100.

Also on December 23, another panel of this Court, "[t]o avoid any uncertainty regarding the various orders of the district court and of this court, . . . clarifie[d] that per the December 22 order of the administrative panel, nothing prohibits the government, in its discretion, from detaining the defendant or from requesting that the district court impose conditions of release pursuant to 18 U.S.C. § 3143." Unpub. Order 2, ECF 81-1. The government then renewed its request for an arrest warrant—this time, *ex parte*—but the new magistrate judge declined to act on that request before the hearing.

On December 29, at the hearing scheduled by the magistrate judge—but taken over by the district judge—the district court ordered a third time that Burger be released, this time with some conditions. Dec. 29 Hr'g 54-57; Order Setting Conditions of Release, *United States v. Burger*, No. 1:25cr332 (W.D. Tex. Dec. 29, 2025), ECF No. 104. The district court rejected the government's arguments that doing so conflicted with constraints on its jurisdiction while an appeal was pending and with this Court's December 23 clarification. Dec. 29 Hr'g 6-7. When the government offered that argument, the district court responded, "I don't

15

care." *Id.* at 6. The district court also repeatedly cut off the government's attempts to offer the testimony of an FBI agent. *Id.* at 14, 16-18, 31, 33-34. Later that day, the government submitted a request for interim relief—that this Court direct the district court to issue an arrest warrant and refrain from further rulings on detention or release—that remains pending.

## Summary of the Argument

**I.** The district court erred in dismissing the indictment pretrial under Federal Rule of Criminal Procedure 12. Rule 12 does not authorize a district court to dismiss an indictment based on an incomplete and disputed factual record. That is especially true when the factual questions the district court is resolving—like how a reasonable person would interpret a threat and the defendant's mental state in issuing it—are ones committed to a jury. The district court also erred by demanding a level of specificity from Burger's threats not supported by this Court's precedent and by dismissing statements made in Roblox as a "game."

**II.** If this Court has not resolved the question of detention or release when it addresses the district court's dismissal of the indictment, it should vacate the district court's second release order. This Court's stay of that order explains why the evidence as a whole does not support it. And the district court erred procedurally by issuing it without reopening the detention hearing and without imposing statutorily required

16

conditions. The district court's third release order does not moot these problems, as that order was issued without jurisdiction and in contravention of this Court's direction on how to proceed.

**III.** When this Court remands, it should also reassign this case to a different district judge. The district judge's comments and repeated issuance of new release orders to circumvent this Court's stays reflect that he is fixed in his views. Reassignment is necessary to preserve the appearance of impartial justice and will not entail disproportionate duplication of effort because this case has not reached trial.

## Argument

### I.     The district court erred in dismissing the indictment because it misapplied Rule 12 and this Court's precedent on true threats.

The district court erred in determining, on a disputed and incomplete pretrial record, that Burger's statements were protected speech rather than unprotected true threats. "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman*, 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. at 359). The modifier "true" distinguishes true threats from "jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Id.* Whether a statement is a true threat depends not on the speaker's mental state but "on what the statement conveys to the person on the receiving end." *United States v. Jubert*, 139 F.4th 484, 490 (5th Cir. 2025). If "an objectively reasonable

person would interpret the speech as a serious expression of an intent to cause a present or future harm," then a statement is a true threat. *Id.* When a true threat is the basis for a criminal prosecution, the government must also show that the speaker was aware of and recklessly disregarded its threatening nature. *See Counterman*, 600 U.S. at 79; *Jubert*, 139 F.4th at 491. When a statement meets these requirements, it is outside the bounds of expression protected by the First Amendment and punishable as a crime. *Counterman*, 600 U.S. at 69; *Jubert*, 139 F.4th at 491.

Importantly, these questions are for a jury to decide at trial—not for a judge to decide as a "gatekeeper," ROA.525. This Court has held that a jury should resolve whether an objectively reasonable person would interpret speech as a serious expression of intent to cause harm. *See, e.g.*, *United States v. Daughenbaugh*, 49 F.3d 171, 173 (5th Cir. 1995) ("Guided by instructions . . . removing protected speech from the definition of 'threat,' the jury is to determine the nature of the subject communication.") (cleaned up); *United States v. Coalwell*, No. 20-50869, 2021 WL 4768286, at *1 (5th Cir. Oct. 12, 2021) ("Whether the language in a communication constitutes a 'threat' is a factual issue for the jury to decide[.]"); *cf. Jubert*, 139 F.4th at 439 (upholding a district court's decision to defer until trial a determination of whether statements were true threats). Determining a defendant's mental state when issuing a threat is likewise "up to the jury." *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001).

18

The district court erred by deciding these questions itself—especially on an incomplete and disputed factual record—and misapplied the law of true threats in the process. ROA.525-30. Because Rule 12 did not authorize dismissal of the indictment on First Amendment grounds, this Court should reverse the district court's dismissal order and remand for trial.

### A.  Standard of review: This Court reviews indictment dismissals de novo.

This Court reviews de novo a district court's pretrial dismissal of an indictment under Federal Rule of Criminal Procedure 12. *Jubert*, 139 F.4th at 489.

### B.  The district court misapplied Rule 12 by improperly resolving disputed facts pretrial.

Whether a district court can dismiss an indictment under Rule 12 "is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (cleaned up), *abrogated on other grounds by Abramski v. United States*, 573 U.S. 169, 191 (2014). "If a question of law is involved, then consideration of the motion is generally proper." *Id.* And a court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Id.* at 324 n.6.

But a district court can dismiss under Rule 12 only "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense" raised by that motion. *United States v. Covington*, 395 U.S. 57, 60 (1969). "If contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). And "[t]here is no authority under Rule 12 . . . to dismiss on the basis of a sufficiency-of-the evidence defense which raises factual questions embraced in the general issue." *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975) (cleaned up).

The district court recognized that it was supposed to limit itself to "undisputed facts," and purported to "accept[] the Government's versions of the facts as true." ROA.525-26. But it did neither. Instead, the district court made its own findings on disputed facts.

First, the district court resolved disputed facts bearing on whether Burger's statements were true threats—that is, whether "an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm," *Jubert*, 139 F.4th at 490 (cleaned up). As noted above, this Court has repeatedly held that a jury should decide this question. *Daughenbaugh*, 49 F.3d at 173; *Coalwell*, 2021 WL 4768286, at *1. But the district court did so itself. It discounted Burger's threats because he issued them in Roblox, which the district

court found to be "a fictional game understood as such by all participants." ROA.527-28. And in dismissing each count of the indictment, the district court reiterated its disputed view that Burger made the threats in a "role-playing context." ROA.528-30.

Those contested findings ignore factual disputes about how Burger and other participants understood Burger's statements in Roblox. Even as the district court purported to focus only on evidence of how the recipients of Burger's threats reacted to them, it ignored those reactions. ROA.527-58. It failed to acknowledge that experienced Roblox users who saw Burger's threats took them seriously and contacted the FBI. ROA.547, 551-55, 647, 656-57, 673-74; Dec. 29 Exs. 1, 3. These fearful reactions are "probative" of whether an objectively reasonable person would interpret a statement as a threat. *Coalwell*, 2021 WL 4768286, at *1; *Daughenbaugh*, 49 F.3d at 174; *see also Jubert*, 139 F.4th at 491 (explaining that while "[f]ear, standing alone, may not be dispositive," fear can also be the "predictable result of deliberate conduct"). The district court also ignored evidence that Burger used Roblox to avoid law-enforcement detection, Dec. 29 Ex. 2a, and that he corresponded with an internet user in Russia who suggested that using Roblox would help him avoid the attention of authorities. ROA.653, 664-65; Dec. 29 Ex. 11.

The district court also made its own findings on disputed evidence about whether Burger had the requisite mental state—that is, whether he was subjectively aware of the threatening nature of his statements,

21

*Counterman*, 600 U.S. at 79; *Jubert*, 139 F.4th at 491. When the recipients of a defendant's statements tell him that those statements cause real-world alarm, but the defendant persists in issuing similar statements, a jury can infer that the defendant knowingly or recklessly disregarded the threatening nature of his statements. *See United States v. Elonis*, 841 F.3d 589, 599-601 (3d Cir. 2016). For example, in *Elonis*, the court held that no rational juror could have found that the defendant was unaware of the threatening nature of his online posts when the recipients of similar posts had told him that the earlier posts alarmed them. *Id.*

A similar scenario played out here. As the government's trial evidence will show, before the threats charged in the indictment, Burger's aunt and uncle confronted him about statements they caught him making that promoted martyrdom and carrying out attacks.[8] Dec. 29 Hr'g

---

[8] One of those statements was:

> No I moved on to the real world and am [w]orking hard to . . .
> [k]ill lots of Western people in Texas
>  . . .
> I think the Austin Police Department
> Would be a good target
> Cuz I hate
> The police so much
> I hate all constitutions and government
> Outside of the Sharia
> And all laws outside of Sharia
>  . . .
> But yah I would
> Definitely kill a lot of cops someday
> I have like a handgun and a couple rifles and a shotgun at my house
> And I'm gonna buy an AR off someone I know lolJit

Dec. 29 Ex. 10a.

34-35. Yet Burger kept issuing similar statements, including the threats charged here. Dec. 29 Exs. 1, 2, 2a, 3, 10a, 10b, 10c, 13-14, 19, 26.

Burger also continued to issue threats after other Roblox users indicated that they were taking those threats seriously. When Burger announced his intent on January 23, 2025, to "deal a grievous wound upon the followers of the Cross," another user responded, "Akhi, we will make dua for u once u martyr," and told a third user, "ALI MY BROTHER IS ABOUT TO DO HIS ATTACK." Dec. 29 Ex. 1. Four days later, Burger announced—in the threat charged in Count Two—that he had decided the date and target of the attack and reiterated that he would "deal a grievous wound on the followers of the Cross." Dec. 29 Ex. 2, 2a.

Evidence of Burger's conduct outside Roblox—evidence the district court improperly and pre-emptively excluded as "out-of-context" and "irrelevant," ROA.527—would further support a jury's finding that he issued the threats knowingly or recklessly. A jury can consider evidence of conduct surrounding a threat to assess the defendant's mental state in making that threat. *See, e.g.*, *United States v. Miah*, 120 F.4th 99, 111-12 (3d Cir. 2024) (affirming admission of evidence that a defendant was familiar with firearms, idolized terrorists, and disliked law enforcement to show his mental state when issuing threats); *United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999) ("The only way a jury could properly assess the sincerity of [the defendant]'s beliefs . . . was to examine the circumstances in which the comments were made."); *United States v. Cox*,

957 F.2d 264, 267 (6th Cir. 1992) (explaining that "the circumstances sur-rounding the making" of threatening calls were "probative of defend-ant's state of mind and tend[ed] to counter his allegation of benign pur-pose"). Burger's history of discussing violent attacks across various plat-forms belies the district court's notion that Burger saw himself as just playing a game in Roblox. *See* Dec. 29 Exs. 1b, 2a, 5,[9] 11, 15, 18-19, 22-23, 25-26. And Burger's preparation for an attack—by training with a ri-fle, searching for festivals, and visiting the website of the company pro-moting a Christian concert on the day he identified for an attack—all un-dermine the district court's benign interpretation of his conduct. *See* Dec. 29 Ex. 9 at 5; Dec. 29 Ex. 24 at 5, 9; Dec. 29 Ex. 13 at 31-34; Dec. 29 Ex. 22 at 3.

### C.   The district court misapplied Rule 12 by improperly resolv-ing disputed facts on an incomplete pretrial record.

Not only did the district court resolve disputed factual questions, but it did so on an incomplete record. The district court said that "the only facts that could possibly support a conviction here" came from four paragraphs in the government's response to the motion to dismiss. ROA.527. But the government never represented that these were the only facts that it would present at trial, and they were not, as the govern-ment's filed exhibit list made clear. ROA.472-73; Dec. 29 Exs.

---

[9] As noted above in note 4, Exhibit 5 from the December 29 hearing was mislabeled as a second Exhibit 4.

The district court erred in assuming otherwise. *See United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021) (affirming a district court's refusal to dismiss under Rule 12 where the government never purported to make a full proffer of its trial evidence). "No circuit" allows dismissal under Rule 12 on an "incomplete or disputed factual record." *United States v. Rodríguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019). Nor did Rule 12 empower the district court to require the government to preview its entire trial presentation. *See United States v. Rafoi*, 60 F.4th 982, 994 (5th Cir. 2023) (explaining that a defendant may not challenge under Rule 12 a facially sufficient indictment as not supported by adequate evidence); *accord Rodríguez-Rivera*, 918 F.3d at 35; *Wedd*, 993 F.3d at 121. That sort of requirement "could effectively force a summary judgment-like motion on the government." *Wedd*, 993 F.3d at 121 (cleaned up). And "federal criminal procedure does not provide for a pre-trial determination of sufficiency of the evidence." *United States v. Sholley-Gonzalez*, 996 F.3d 887, 893 (8th Cir. 2021) (cleaned up).

The reasons for this approach are several, as then-Judge Gorsuch has explained. *Pope*, 613 F.3d at 1259-60. Chief among them is the risk that the district court will usurp the role of the jury, whose members are "charged with determining the general issue of a defendant's guilt or innocence." *Id.* at 1259. Even in cases where the court's determination of the merits of a legal defense is appropriate, "evidence adduced at trial can provide a 'more certain framework' for its analysis[,]" especially

25

considering the uncertainty of "what evidence will and won't be admissible" at trial. *Id.* Conducting a pretrial hearing at which the government would have to preview all its trial evidence—or risk dismissal—would waste judicial resources, since the district court would likely "repeat the exercise with largely the same evidence a short time later at the trial itself." *Id.* And forcing the government to preview its trial evidence would permit "an end-run around the limited discovery rules governing criminal prosecutions." *Id.*

The district court's misunderstanding of this aspect of Rule 12 is evident from its comments that it was "seeing its role as a gatekeeper" akin to the role it might play in civil litigation like "patent cases." ROA.687. "Rule 12 is not a parallel to civil summary judgment procedures." *Pope*, 613 F.3d at 1261. Instead, Rule 12 "helps draw and police [the] distinction between civil and criminal procedure." *Id.* at 1260. In failing to recognize this distinction, the district court erred.

Neither of the published cases the district court relied on, ROA.525, establish that this Court has somehow bound itself to a contrary rule. In *Flores*, the Rule 12 motion hinged on a purely legal question about the interaction between two statutes: whether an alien who entered the country illegally and later qualified for temporary protected status, 8 U.S.C. § 1254a, was "illegally or unlawfully in the United States," 18 U.S.C. § 922(g)(5)(A). *Flores*, 404 F.3d at 324 & n.5, 326. In *Daughenbaugh*, this Court did not address dismissal under Rule 12 at all, because there the

issue was the sufficiency of the trial evidence presented to the jury. 49 F.3d at 173.

Nor does this Court's unpublished decision in *United States v. O'Dwyer*, 443 F. App'x 18 (5th Cir. 2011), offer persuasive support for a different approach. No case cited in that decision supports the notion that a district court deciding a Rule 12 motion should try to forecast what a reasonable jury could find based on a full trial record. *See id.* at 20 (citing *Daughenbaugh*, 49 F.3d 171, and *Morales*, 272 F.3d 284). In *Daughenbaugh*, and again in *Morales*, this Court applied the "reasonable jury" standard because it was reviewing district courts' decisions under Federal Rule of Criminal Procedure 29 not to grant a judgment of acquittal *after* trial. *See Daughenbaugh*, 49 F.3d at 173; *Morales*, 272 F.3d at 287. And even if there were some support for applying a "reasonable jury" standard to a pretrial record, *O'Dwyer* involved a much different statement: one this Court has characterized as "vague speculation about becoming homicidal," *Jubert*, 139 F.4th at 491. Burger's statements were not "vague speculation"; he threatened to attack Christians attending a concert on a specific date and to attack law enforcement officers who attempted to arrest him. ROA.36-43, 45, 359-63.

### D. Burger's threats to attack Christians and law enforcement were unprotected true threats.

The district court also erred by applying a standard for true threats inconsistent with binding precedent. A statement is an unprotected true

27

threat punishable as a crime when (1) "an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm" and (2) the speaker was aware of and recklessly disregarded its threatening nature. *Jubert*, 139 F.4th at 491 (cleaned up). Each count of the indictment charged a true threat that met both requirements.

### 1.  Counts One and Two allege unprotected true threats against a Christian music festival.

In the statement charged in Count One, Burger said he would "deal a grievous wound upon the followers of the Cross" in "April"—a "glorious wound," in his estimation—and that "things [we]re in motion." ROA.37-41. The indictment alleges that Burger made this threat to a "Christian concert." ROA.96-98. This allegation in the indictment is based on a witness's report and anticipated trial testimony about statements by Burger (as Crazz3pain) not captured in screenshots, including that he would do something at a Christian music concert, punish worshippers of the Cross, and become a martyr. ROA.554-55.

A few days later, in the statement charged in Count Two, Burger added details to the threat issued in Count One. The trial evidence will show that Burger, over a platform called Discord, told a user in Saudi Arabia that he had "come to a conclusion on the when and where." Dec. 29 Ex. 2a. That Saudi Arabian user invited Burger to Roblox, where Burger announced that he had "conclude[d]" that on April 12, he hoped

to "attain martyrdom [a]nd deal a grievous wound upon the followers of the Cross" at a "music festival" "[a]ttracting bounties of Christians." ROA.37, 45.

Each of these statements met both requirements for unprotected true threats. An objectively reasonable person would regard this speech as serious, as demonstrated by the reaction of the Roblox user who witnessed the statements charged in Count One and alerted the FBI. *See Coalwell*, 2021 WL 4768286, at *1; *Daughenbaugh*, 49 F.3d at 174. And, as the indictment alleges, Burger issued these statements "with knowledge that the communication w[ould] be viewed as a threat and recklessly disregarding a substantial risk that his communication would be understood as a threat." ROA.96-98. He was already aware that his aunt and uncle regarded similar statements as threatening. *See supra* pp. 22-23 & n.8. And he persisted in the statements despite the reaction of the Roblox users around him. ROA.36-43. When Burger began issuing the threat charged in Count One, another user asked, "u sure its no joke thing," and another responded, "yes, i know him" and, later, "ALI MY BROTHER IS ABOUT TO DO HIS ATTACK." ROA.38, 42. As part of this exchange, Burger said he "c[ould] not confirm anything aloud"—suggesting that he recognized that others might take him seriously and thwart any detailed plans. ROA.41. Even so, Burger returned to the same chat room in Roblox days later and issued a similar but even more specific threat. ROA.45.

The district court erred in discounting these statements as "not threaten[ing] harm" to a "particularized group," ROA.528-29. A threat need not "name 'a particular individual or group of individuals'" because none of the factors that renders threats unworthy of First Amendment protection "turns on whether a speaker names individuals or merely places them where those individuals are likely to be." *United States v. Perez*, 43 F.4th 437, 443-44 (5th Cir. 2022) (quoting *Virginia v. Black*, 538 U.S. at 359). Count One identified a threat to attack Christians at a Christian music concert in a "capit[a]l" in April. ROA.38-39, 96. Count Two identified an even more specific threat—to attack a "music festival . . . [a]ttracting bounties of Christians" on the specific day a Christian concert was planned for Austin, Texas. ROA.45, 97. Those threats placed a group of individuals where they were likely to be.

The district court also erred in suggesting that the statements charged in Count One did not amount to a true threat because Burger "did not state a specific means" or "time . . . of attack." ROA.528. As part of the exchange charged in Count One, Burger told another user he could check Discord, an online-communication platform, where he apparently posted photographs of guns. ROA.13-14. This indication of an intent to use firearms was at least as exact as the statement a jury reasonably found to be a true threat in *Morales*, 272 F.3d at 286, 288 ("[I]F NE ONE STANDS N MY WAY WILL SHOT"). And Burger did not need to "state a specific . . . time . . . of attack" to make these statements a

30

true threat. In *Morales*, the defendant did not explain when he would attack beyond the valediction "SEE U IN A COUPLE OF MONTHS." 272 F.3d at 286. Yet this Court still held that "a reasonable juror could find all the facts necessary to make Morales's communication a 'true threat.'" *Id.* at 288.

### 2. Count Three alleged a true threat against law enforcement.

In the statement charged in Count Three, Burger stated that if "the authorities" tried to arrest him, he would "[d]etonate what [he had] prepared [o]f munitions [a]nd use [his] firearms [t]o take many with me . . . [o]n the path of martyrdom." Dec. 29 Ex. 3; ROA.96-98.

This statement, too, met both requirements for true threats. An experienced Roblox user in Pennsylvania saw this statement and took it seriously enough to report it to the FBI. Dec. 29 Ex. 3; Dec. 29 Hr'g 33-34. And Burger knew or recklessly disregarded the threatening nature of these statements: He had already made similar threats against law enforcement and knew that his aunt and uncle found them alarming. *See supra* pp. 22-23 & n.8.

This statement was still a true threat even if it was conditioned on authorities trying to arrest Burger. *See United States v. Myers*, 104 F.3d 76, 78-79 (5th Cir. 1997). For example, in *Myers*, the defendant issued a conditional threat: He told a congressional aide he was "talking about body bags" *if* nothing was done to help his sick wife. *Id.* at 78. This Court held

31

the evidence "more than sufficient" to show that these statements met the test for a true threat. *Id.* at 79.[10]

The district court was also wrong to suggest that Burger's threat against "authorities" trying to "arrest" him was not "targeted" enough to be a true threat, ROA.529. By identifying his targets as law enforcement officers trying to arrest him, he directed a threat at a place "those individuals [were] likely to be," *Perez*, 43 F.4th at 443. That was enough. *See id.*

### 3. That Burger's threats appeared in the online platform Roblox did not mean they were not true threats.

The district court also discounted all three threats because they appeared in the Roblox platform. It asserted that Burger made the threats in a "role-playing context" that was "a fictional game understood as such by all participants." ROA.527-30. And it concluded that Burger and other Roblox users were just *"playing a game."* ROA.527-28.

That Burger's statements appeared in Roblox did not prevent Burger's statements from being true threats as a matter of law. First, this Court has declined to rule that statements were not true threats as a matter of law even when context could be read to undermine the seriousness of the threat. For example, in *Perez*, this Court upheld the jury's finding that a reasonable person could take the defendant's statements about

---

[10] Because this Court held in *Myers* that a conditional threat can be a true threat, *see* 104 F.3d at 78-79, the unpublished decision in *O'Dwyer*, 443 F. App'x at 20, cannot support a rule that conditional statements cannot be true threats.

COVID-19 exposure seriously even though they were delivered alongside cry-laughing and winking emojis. 43 F.4th at 443. Second, two witnesses familiar with Roblox generally and the "Church" chat room in particular took Burger seriously. Although "[f]ear, standing alone, may not be dispositive," that fear can also be the "predictable result of deliberate conduct." *Jubert*, 139 F.4th at 491. Third, nothing in the record of this case—or the public record—establishes that Roblox is used exclusively for game playing or role playing. Criminals use Roblox to commit crimes too.[11]

At a minimum, whether the context in which Burger issued his threats rendered them unserious was a jury question. *See, e.g.*, *Perez*, 43 F.4th at 443. This Court should reverse the district court's pretrial determination of that issue.

---

[11] *See* Osmond Chia, *Texas sues Roblox for 'putting paedophiles and profits' over safety*, BBC (Nov. 6, 2025), https://www.bbc.com/news/articles/cy0kd4kk0kqo (noting that at least three states so far have sued Roblox over potential harms to children); Queenie Wong, *'Real-life nightmare for kids.' 'Roblox' faces multiple lawsuits over child safety*, L.A. Times (Aug. 15, 2025), https://www.latimes.com/business/story/2025-08-15/roblox-faces-lawsuits-over-child-safety ("Sextortionists have used a variety of platforms, including social media gaming platforms such as 'Roblox,' . . . to threaten victims."); Natalie Neysa Alund & Benjamin Johnson, *'Burn the infant': Woman convinced child to try to kill 2-month-old on Roblox, police say*, USA Today (Oct. 23, 2204), https://www.usatoday.com/story/news/nation/2024/10/23/tara-sykes-roblox-convinced-child-kill-baby-pensacola/75804569007/ (reporting skull fracture suffered by infant dropped by child instructed to do so over Roblox).

## II. The district court abused its discretion in releasing Burger unconditionally.

If this Court has not resolved the government's motion to vacate the district court's second release order when it reaches the merits of the indictment dismissal, it should grant that motion. This Court should also clarify that the third release order—which was issued without jurisdiction and is therefore a nullity—did not moot any prior order.

### A. Standard of review: This Court asks whether the evidence as a whole supports the release order.

In an appeal of a district court's pretrial-release order, this Court asks "whether the evidence as a whole supports the conclusions of the proceedings below." *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992). Although this standard is "deferential," this Court will vacate a release order that "simply is not supported by the proceedings below." *Id.* at 586-87. This standard "is akin to abuse of discretion." *United States v. Cabello*, No. 25-40482, 2025 WL 2738463, at *1 (5th Cir. Sept. 23, 2025). "A district court by definition abuses its discretion when it makes an error of law or applies an incorrect legal standard." *Id.* (quoting *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011)).

### B. The evidence as a whole does not support the district court's order releasing Burger unconditionally.

The magistrate judge found after a hearing that Burger was too dangerous to release while the case against him is pending. ROA.33-34, 609. And this Court stayed the district court's first order releasing Burger without supervision. Unpub. Order, ECF No. 28-1. The district court's

34

issuance of another order releasing Burger without supervision—a day after this Court stayed the first such order—lacked support in the record.

The record from the detention hearing amply supported the magistrate judge's finding that detention was necessary. The exhibits show the statements on Roblox that gave rise to Counts One and Two of the indictment and photos of Burger posing with guns. ROA.36-47. Those exhibits also include handwritten materials recovered when Burger moved from state to federal custody in May 2025. ROA.50-61, 567-70. These handwritten materials include notes on bomb-making and a list of terrorist attacks bearing the notation "#JeSuisISIS" ("I am ISIS"). ROA.50-60, 570. An agent testified that the materials listed in the bomb-making notes could potentially be used to produce a destructive device. ROA.568. Agent testimony also established that Burger's conduct troubled his family enough that they installed a keylogger on his computer and removed firearms from the house where he was then living. ROA.557-58, 562.

The record developed after the detention hearing only reinforced the magistrate judge's finding. As the government explained to the district court, the evidence showed that

- Burger's statements about a pending attack on Christians corresponded to the date of a Christian music concert promoted by a company whose website Burger visited, ROA.467-68, 484;

- Burger searched the internet for "lone wolf terrorist isis," "Festivals happening near me," and suicide attacks, ROA.392, 483;

- Burger pledged allegiance to the head of the Islamic State and stated he wanted to attack and kill Austin police officers, Att. ROA.392, 485;

- Burger stated that he was willing to sacrifice himself "in a blaze of iron and metal . . . raining bullets upon disbelievers and their soldiers/police," ROA.485;

- Burger was training with a rifle and saving for a suppressor, ROA.468; and

- Burger discussed that he wanted to put knives to people's throats and carry out a knife attack like a "friend" in Europe, ROA.392, 485.

In explaining its stay of the second release order, this Court noted the lack of support for that order on this record. Unpub. Order 3, ECF No. 79-1. As this Court noted, "there ha[d] been no involvement by Pre-trial Services" in developing the second release order. *Id.* Instead, "the district court's reasoning reflect[ed] only the representations of defendant's counsel." *Id.* And the district court concluded that no conditions of release were necessary despite the concession by defense counsel that Burger "require[d] supervision" and "monitoring." *Id.*; ROA.605.

36

Considering the evidence as a whole—especially compared to the unsworn assertions the district court accepted—the district court abused its discretion in releasing Burger unconditionally.

### C. The district court erred procedurally in releasing Burger on personal recognizance.

The district court also disregarded statutory requirements in arriving at its order releasing Burger unconditionally.

### 1. The district court erred procedurally by failing to reopen the detention proceeding.

This Court's administrative-stay order allowed the district court to consider relief under 18 U.S.C. § 3143, which governs release or detention when, as in this case, the government has appealed under 18 U.S.C. § 3731. Section 3143(c) directs that a judicial officer "treat a defendant in a case in which an appeal has been taken by the United States under section 3731 of this title, in accordance with section 3142 of this title, unless the defendant is otherwise subject to a release or detention order." Disregarding § 3142 as a whole, the district court focused solely on § 3142(b), which allows release on personal recognizance. ROA.514-15.

That was procedural error. Under § 3142 (f)(2)(A), "[t]he judicial officer"—the magistrate judge—had already held a detention hearing because there was a serious risk that Burger would flee. *See* ROA.23-24, 542-612. The judicial officer determined after that hearing that Burger had to be detained because no condition or combination of conditions would reasonably assure his appearance and community safety. ROA.33-

37

34. Section 3142(f) specifies that the mechanism to revisit that determination is the judicial officer's reopening the hearing: "The hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on" the defendant's risk of flight and to community safety. If a judicial officer could simply invoke § 3142(b) without reopening the hearing, the new-information requirement in § 3142(f) would be meaningless. The district court's invocation of § 3142(b) illustrates this point: It tossed aside the magistrate judge's determination without considering the evidence undergirding the previous detention order and without allowing the parties to present and test new evidence.

For several reasons, the district court's unconditional-release order has no support in a separate provision authorizing "[r]eview of a detention order," 18 U.S.C. § 3145(b). First, neither Burger nor the district court invoked that provision. ROA.505-07, 514-15. Second, no part of the district court's unconditional-release order "review[ed]"—or even mentioned—the magistrate judge's order. *See Cabello*, 2025 WL 2738463, at *1 (explaining what review under § 3145(b) requires). Third, this Court's administrative stay did not authorize the district court to proceed under § 3145.

If the district court wanted to revisit the detention order, it should have directed the magistrate judge to reopen the detention hearing and to

hear additional, material evidence from the parties. *See* § 3142(f). Circumventing that process was procedural error. And that procedural error was by definition an abuse of discretion. *See Cabello*, 2025 WL 2738463, at *1.

### 2. The district court erred procedurally by failing to follow the release provision it invoked.

Even if the district court could have invoked § 3142(b), it erred procedurally—and thus abused its discretion—in implementing that provision. Release on personal recognizance must be "subject to the condition that the person not commit a Federal, State, or local crime during the period of release" and that "the person cooperate in the collection of a DNA sample." § 3142(b). The district court did not impose even those minimal conditions when it released Burger. ROA.514-15. That error by itself justifies vacating the district court's second release order.

### D. The district court lacked jurisdiction to enter its third release order, which remains a nullity.

Burger now claims that the district court's third release order moots the second. *See* Burger Resp. to U.S. Ltr. on Interim Relief 3, ECF No. 97. He is wrong because the district court lacked jurisdiction to issue the third release order, which is therefore a nullity.

It is a "longstanding tenet of American procedure" that "[a]n appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal.'" *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident*

39

*Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)). Thus, a notice of appeal is "'an event of jurisdictional significance'" that "'confer[s] jurisdiction on the court of appeals and divest[s] the district court of its control over those aspects of the case involved in the appeal.'" *United States v. Willis*, 76 F.4th 467, 471 (5th Cir. 2023) (quoting *Griggs*, 459 U.S. at 58). This Court has called this tenet the "one-court-at-a-time rule." *Id.* at 471.

This rule deprived the district court of jurisdiction to issue its third release order. The government has appealed from the district court's decisions to release Burger pending appeal. ROA.496, 532. Those appeals placed the question whether Burger should be released or detained squarely before this Court. *See Willis*, 76 F.4th at 471. The district court's effort to revisit that question during a pending appeal was "null and void." *Id.* at 473.

This Court's December 23 clarification of its stay orders did not permit the district court to proceed despite the one-court-at-a-time rule. "To avoid any uncertainty," this Court clarified that it was leaving open one avenue during the government's appeals: "per the December 22 order of the administrative panel, nothing prohibits the government, in *its* discretion, from detaining the defendant or from requesting that the district court impose conditions of release pursuant to 18 U.S.C. § 3143." Unpub. Order 2, ECF No. 81-1 (emphasis added). The government exercised its discretion by seeking an arrest warrant to secure Burger's detention. U.S. Mot. for Arrest Warrant, *United States v. Burger*, No.1:25cr332

40

(W.D. Tex. Dec. 23, 2025), ECF No. 99. Nothing about this Court's order put "the fox in charge of the henhouse," by vesting discretion in the government rather than the "Article III district court." Burger Resp. to U.S. Ltr. on Interim Relief 1-2, ECF No. 97. This Court—also an Article III court—directed that result. *See* Unpub. Order 2, ECF No. 81-1.

Burger argues that this Court lacks jurisdiction to address the district court's third release order because that order is not listed in a notice of appeal. Burger Resp. to U.S. Ltr. on Interim Relief 1-2, ECF No. 97. Simultaneously, he argues that the third release order moots the second release order. *Id.* at 3. But to determine whether the third release order moots the second, this Court must address whether the third release order was, by virtue of the one-court-at-a-time rule, "null and void," *Willis*, 76 F.4th at 473.

Burger also points out that 18 U.S.C. § 3145(b) generally authorizes district courts to review detention orders. Burger Resp. to U.S. Ltr. on Interim Relief 2, ECF No. 97. But even when a statute generally authorizes a district court to take some action, it does not give the district court jurisdiction to take that action during an appeal of that issue. *See Willis*, 76 F.4th at 473. Unless a statute provides a "clear statement" to the contrary, the one-court-at-a-time rule controls. *See id.* Section 3145 includes no such clear statement.

Lastly, Burger argues that the district court retained jurisdiction to release Burger under § 3145 because the government's appeal addresses

an order issued under a separate provision, 18 U.S.C. § 3142. Burger Resp. to U.S. Ltr. on Interim Relief 2-3, ECF No. 97. But the government's appeals challenged—and therefore put before this Court—the broader question of release or detention. Burger's selective quotations from the government's motion obscure that the district court's jurisdictional problem was not just that it did not invoke § 3145(b), but that this Court's stay order did not authorize it to do so. U.S. Emergency Mot. to Vacate 16-17, ECF No. 51-1. And Burger's suggestion that the district court was invoking some separate power under § 3145, rather than § 3142, is belied by the third release order, which explicitly invokes § 3142. Burger Resp. to U.S. Ltr. on Interim Relief 2-3, ECF No. 97; Order Setting Conditions of Release 2, *United States v. Burger*, No.1:25cr332 (W.D. Tex. Dec. 29, 2025), ECF No. 105.

At bottom, Burger is arguing that a district court can evade this Court's stay orders and moot this Court's review by issuing a new order while this Court considers a previous one. The one-court-at-a-time rule is designed to prevent that sort of clash. *See Willis*, 76 F.4th at 471.

## III. This Court should reassign this case to a different district judge on remand.

Finally, this Court should reassign this case. Although this power is "extraordinary" and "rarely invoked." *United States v. Khan*, 997 F.3d 242, 248 (5th Cir. 2021), the district judge's comments and conduct warrant exercising it here.

This Court uses "two separate, but related tests"—often in tandem—to decide whether to reassign a case. *Id.* at 248-49; *see also Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892-93 (5th Cir. 2021). The first test weighs three factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous based on evidence that must be rejected;
>
> (2) whether reassignment is advisable to preserve the appearance of justice; and
>
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Khan*, 997 F.3d at 249 (cleaned up). The second test "aligns with" the second factor and "simply requires this Court to reassign when the facts might reasonably cause an objective observer to question the judge's impartiality." *Id.* (cleaned up). All three factors of the first test—and the second test—support reassignment.

First, "the cumulative weight of both prejudicial comments and peremptory rulings by the district judge" shows that the district judge would have trouble putting out of his mind previously expressed, erroneous views, *Miller*, 986 F.3d at 893.

- At a hearing on Burger's motion to dismiss, the district judge— without having heard all the government's trial evidence—said, "[I]f we go to trial, the jury would never know this, but if I were on the jury, I would acquit him." ROA.641. The district judge then

dismissed the indictment and released Burger without written explanation until a week after this Court directed him to provide one. ROA.495, 523-30; Unpub. Order, ECF No. 28-1.

- When this Court intervened on an emergency basis to stay an order releasing Burger unconditionally, the district judge issued another order releasing Burger unconditionally the next day. ROA.514-15; Unpub. Order, ECF No. 28-1. As this Court has explained, that second release order hinged on the district judge's acceptance—without vetting by Pretrial Services—of representations by Burger's counsel and ignored the concession by Burger's counsel that he needed supervision. Unpub. Order 3, ECF No. 79-1

- When this Court intervened again to stay the second release order, the district judge took over a hearing scheduled by a magistrate judge for the magistrate judge's courtroom and released Burger again. Dec. 29 Hr'g 5, 54-57. The district judge responded to the government's effort to explain its reading of this Court's orders with, "I don't care." *Id.* at 7.

- At the same hearing, the district judge repeatedly cut off the government's attempts to offer the testimony of an FBI agent. Dec. 29 Hr'g 14, 16-18, 31, 33-34.

- Also at that hearing, the district judge asserted that a decision by this Court reversing his dismissal would result in "an impossible

44

trial" based on an issue the parties had agreed was resolved. Dec.

29 Hr'g 25-26, 28-29; ROA.405.

These statements and actions show that the district judge is "fixed in his

view" of what the result of this case should be, *Khan*, 997 F.3d at 249.

Second, for these reasons and others, reassignment is advisable to

preserve the appearance of justice, and an objective observer would ques-

tion the district judge's impartiality. The district judge has suggested

based on his own speculation that the government was prosecuting

Burger selectively: "I think you could probably have an argument too

about selective prosecution" because "with a little elbow grease, they

could find a dozen people who said equally vile things." ROA.643. And

the district judge questioned the credibility of the government's attorney

when he opposed allowing Burger to attend Christian religious gather-

ings after threatening a Christian religious gathering. Dec. 29 Hr'g 53.[12]

Third, reassignment would not entail waste and duplication out of

proportion to any gain in preserving the appearance of fairness. This dis-

trict judge has handled motions practice, but the case has not proceeded

to trial. *Cf. Miller*, 986 F.3d at 893 (noting that civil case had not

---

[12] The district judge stated: "You know, sometimes I just ask questions to measure the credibility of counsel and everything that they say. Sometimes those answers make me happy and sometimes they disappoint me. I'll let you figure out which case that was with your answer." Dec. 29 Hr'g 53. The district judge then allowed Burger to attend. *Id.* at 56.

proceeded past discovery). Reassignment would allow a new district judge to approach trial afresh and promote the appearance of fairness.

## Conclusion

This Court should reverse the district court's order dismissing the indictment, vacate the district court's release orders, and remand this case for trial before a different district judge.

Respectfully submitted,

Justin R. Simmons
United States Attorney

*/s/ Zachary C. Richter*

By:   Zachary C. Richter
Mark T. Roomberg
Assistant United States Attorneys

**Certificate of Service**

I certify that on January 2, 2026, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

/s/ Zachary C. Richter
Zachary C. Richter
Assistant United States Attorney

\*    \*    \*

**Certificate of Compliance**

I certify that:

(1) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order of December 23, 2025, because this brief contains 11,023 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated:    January 2, 2026

/s/ Zachary C. Richter
Zachary C. Richter
Assistant United States Attorney